## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KIRA CABAN,　　　　　　　　　　　\*

　　Plaintiff　　　　　　　　　　　\*

　　v.　　　　　　　　　　　　　　\*　　　　　CIVIL NO. JKB-17-1872

MET LABORATORIES, INC.,　　　　\*

　　Defendant.　　　　　　　　　　\*

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

### MEMORANDUM

This is an employment dispute. Plaintiff Kira Caban worked for Defendant MET Laboratories ("MET") for four days in 2016 before MET terminated her employment. Caban sued MET, claiming sex discrimination pursuant to Title VII of the Civil Rights Act of 1964 and the Pregnancy Discrimination Act of 1978. 42 U.S.C. §§ 2000e-2(a), 2000e(k). Following discovery, MET has moved for summary judgment. Caban opposes summary judgment and, in response to MET's reply, seeks to file a surreply. The motions have been fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2019). For the reasons set forth below, the Court will deny Caban's motion for leave to file a surreply and deny MET's motion for summary judgment.

### I.　Factual Background

#### A. Caban's Hiring

On February 25, 2016, MET hired Caban for the role of Marketing Manager in its Sales Department. (Def. Exh. 1, Caban Dep. at 34:6–18, ECF No. 33-3; Def. Exh. 2, Offer Ltr., ECF No. 33-4.) MET has nearly 200 employees and provides engineering and testing services to corporate and government clients. (Pl. Exh. 12, Position Statement at 3, ECF No. 40-12.) MET's

Vice President Kevin Harbarger recommended Caban for the job, and Rob Frier, MET's President, hired her. (Pl. Exh. 2, Frier Dep. at 17:2–18:20, ECF No. 40-2.) Frier does not remember why he chose to hire her specifically. (*Id.*) Harbarger extended Caban the employment offer and became her direct supervisor. (Def. Exh. 2, Offer Ltr.) Frier was not a direct supervisor, but he actively participated in employee discipline at MET. (Pl. Exh. 6, Pitta Dep. at 50:5–8, ECF No. 40-6.)

MET gave Caban a start date of March 7, 2016. (Def. Exh. 2, Offer Ltr.) Because Harbarger was scheduled to be in China and, thus, out of the office from March 7 to March 10, Harbarger met with Caban the week before to discuss Caban's work assignments in his absence. (Def. Exh. 1, Caban Dep. at 70:11-71:20.) Harbarger showed Caban the facilities, described the industry, and discussed upcoming projects and events. (*Id.*)

Also during the week preceding her first day, Caban asked Harbarger if she could work from home on Wednesday, March 9, because she had a doctor's appointment midday. (Def. Exh. 8, Email re: March 9th, ECF No. 33-10.) Harbarger denied this request, saying that he would normally be fine with her working from home but that, on only her third day, she would have a lot of catching up to do. (*Id.*) Caban later informed Harbarger that she would be in the office before and after her Wednesday appointment. (Pl. Exh. 24, ECF No. 40-24; Def. Exh. 13, ECF No. 33-15 (hereinafter "Email re: Kira's time").)

### B. Caban's First Day

On Monday, March 7, Caban participated in an onboarding meeting. (Def. Exh. 1, Caban Dep. at 37:13–19.) Sherry Salling, MET's Human Resources Director, conducted the meeting, which lasted between thirty minutes to an hour. (*Id.* at 39:4–8.) Sara Lincoln, the Marketing Coordinator, who would be Caban's subordinate, also attended. (*Id.* at 38:1–2, 44:14–15, 46:9–13.) Salling, Lincoln, and Caban each provided statements as to what occurred at this meeting.

Salling limited the onboarding discussion to human resources issues. (Pl. Exh. 3, Salling Dep. at 51:2–5, ECF No. 40-3.) Salling told Caban that she had two options for her work hours: Caban could either work the 8:00AM to 4:30PM shift or the 8:30AM to 5:00PM shift. (*Id.* at 51:4–12.) In her deposition, Salling testified that she told Caban that she could work either shift for the first week and that, once Harbarger returned, he would tell her which shift to work. (*Id.*) By contrast, in answering the interrogatories, MET stated that Salling described the two shifts but—instead of telling Caban to work either one—instructed Caban to ask Harbarger, who was regularly responding to emails, which shift to work. (Pl. Exh. 10, Interrogs. at 8, ECF No. 40-10.) Caban characterized this discussion differently, stating that she asked about her working hours, but Salling told her she would have to work them out with Harbarger. (Pl. Exh. 1, Caban Decl. ¶ 7, ECF No. 40-1.) Salling instructed Lincoln to show Caban how to log her hours, and Lincoln did so, explaining that Caban should log eight hours a day. (Def. Exh. 1, Caban Dep. at 44:7–20.)

Salling referred Caban to the employee manual. When onboarding new employees, Salling generally "just touch[es] on the main points" and "let[s] the employees know that it is on the internet." (Pl. Exh. 3, Salling Dep. at 59:4–11.) Salling testified that she told Caban that the manual was on the internet. (*Id.*) By contrast, Caban testified that Salling said she would send Caban the manual. (Def. Exh. 1, Caban Dep. at 38:3–11.) When asked about that statement in her deposition, Salling responded, "I don't send out copies of the employee manual." (Def. Exh. 4, Salling Dep. at 59:18–21, ECF No. 33-6.) It is undisputed that Salling did not show Caban a copy of the manual at the onboarding meeting; nonetheless, Caban signed a form stating that she had reviewed the manual and discussed it with her supervisor. (Def. Exh. 5, ECF No. 33-7; Pl. Exh. 9, ECF No. 40-9 (hereinafter "Form"); Def. Exh. 1, Caban Dep. at 36:4–37:9 ("I signed the form

but I had not received the actual employee manual.").) According to Caban, she did not see the employee manual until after her termination. (Def. Exh. 1, Caban Dep. at 37:5–9.)

### C. The Employee Manual

MET's employee manual is an online document. (Pl. Exh. 2, Frier Dep. at 75:2–3; Def. Exh. 6, ECF No. 33-8; Pl. Exh. 13, ECF No. 40-13 (hereinafter "Manual").) The manual applies to all employees, including managerial employees. (Pl. Exh. 2, Frier Dep. at 19:13–20.)

Under "Regular Working Hours," the manual states that exempt employees, like Caban, "are expected to work at least 8 hours per day and must properly record their time." (Manual at 31.) "All employees are responsible for honestly and completely recording their time. . . . on a daily basis." (*Id.*) "The normal workday for all employees is 8 hours not including lunch." (*Id.*) "The duration of the lunch break is typically 30 minutes," and "[a]ny extended break will need to be compensated for on the same day." (*Id.* at 32.) The manual notes that "[p]oor attendance and excessive tardiness are disruptive," and either one or the "[f]ailure to properly account for one's time can be cause for discipline or termination of employment." (*Id.* at 31, 32.)

The eight hours must generally be worked at the office. "All salaried employees are expected to work on the company premises during normal work hours." (*Id.* at 32.) "If salaried personnel are not present for whatever reason during the normal work hours, then the time must be accounted for as personal time on their time sheets." (*Id.*) Under "Working from a Remote Location," the manual states, "MET encourages employees to work in the office versus working at a remote location during normal business hours." (*Id.* at 37.) To work remotely, employees must seek approval from their managers in advance. (*Id.*)

These policies support MET's goal of creating an office in which employees are always present during core business hours. (*See* Pl. Exh. 2, Frier Dep. at 56:14–20 ("[W]e try to maintain

4

core hours when everyone is in the office so there's not perfect overlap, . . . but we do like to have core hours where everyone's in the office and those core hours would be starting at 8:30.").) All MET employees are expected to work regular 8.5-hour shifts, with a mandatory half hour lunch break, at the office. (*Id.* at 49:13–50:5; *see also id.* at 57:15–18 ("If you come in a certain time you leave at least 8 and a half hours after the time you arrived.").) Frier clarified, "In other words, you can't work through lunch." (*Id.* at 102:10–11.)

Several supervisors warned or disciplined their subordinates for not working eight hours during regular working hours. (*See, e.g.*, Pl. Exh. 8, Kekovski Dep. at 6:1–7:16, ECF No. 40-8 (giving subordinate an official write-up about working a full day when subordinate left 45 minutes before her scheduled departure and 30 minutes before 8.5 hours).) Salling testified that MET is "very, very strict" about its attendance policy. (Pl. Exh. 3, Salling Dep. at 27:3–7.) By contrast, Lincoln stated that timekeeping was sporadically enforced. (Pl. Exh. 5, Lincoln Decl. ¶ 5, ECF No. 40-5; *see id.* ¶ 11 ("It was routine for employees to be a few minutes later than their scheduled start time and they were not routinely punished for it.").)

### D. *Pumping Accommodations*

When Caban started working at MET, she had a six-month-old child. (Pl. Exh. 1, Caban Decl. ¶ 2–3.) Harbarger testifies that he knew Caban had an infant at the time he recommended her for hire. (Pl. Exh. 4, Harbarger Dep. at 19:21–20:11.) No one else at MET knew that Caban was a mother. No one, even Harbarger, knew that Caban was breastfeeding when she was hired. (Def. Exh. 1, Caban Dep. at 80:12–18 ("I didn't tell them.").)

At the onboarding meeting, Caban informed Salling that she would need a private space where she could pump breast milk at work. (Def. Exh. 1, Caban Dep. at 76:8–10.) Because Caban shared an office with Lincoln, Salling found Caban an unused file room on Caban's hallway. (*Id.*

at 77:2–19.) Salling kept the file room key, and Caban retrieved it each time she needed to pump. (*Id.* at 77:20–78:8.) Caban found the file room an appropriate accommodation. (*Id.* at 80:3–6.) Caban stuck a post-it note on the door, saying "Pumping in Progress." (*Id.* at 110:7–8.) During her four days at MET, Caban went to the file room to pump every two to three hours for a daily total of "45 minutes maybe." (*Id.* at 78:13–79:9.)

MET had accommodated several women who pumped during the workday. (Pl. Exh. 10, Interrogs. at 7–8.) One employee pumped for three of her children during her time at MET and continues to work there. (*Id.*) Another pumped for a year as a MET employee and continues to work there. (*Id.*) A third MET employee requested and received pumping accommodations, but she voluntarily resigned in 2016 to accept a job closer to home. (*Id.*) Unlike Caban, all of these women had their own office in which they pumped, so they did not have to retrieve a key and go to an unused room each time they pumped. (Def. Exh. 1, Caban Dep. at 79:17–19.)

Salling told Frier that Caban was pumping at work. On the Tuesday of the week at issue, Frier emailed Harbarger to inform him. (Def. Exh. 12, ECF No. 33-14; Pl. Exh. 26, ECF No. 40-26 (hereinafter "Email re: A word about Kira").) Frier mentioned pumping in the context of letting Harbarger know that his subordinate was not working enough:

> Today (Tuesday) I saw her arrive at about 8:45. I just noticed at 4:45 that she was gone. I did not see her leave. Also, you may not be aware but she is "pumping" several times a day. Sherry set her up with the accounting file room. She certainly has every right to do that and I believe it can be done in work time. However, if I were pumping (which I am not). I would try to make sure I put in a solid 8.[1]

---

[1]    When asked in deposition why Frier pointed out that he was not pumping, Frier testified, "That was a joke." (Pl. Exh. 2, Frier Dep. at 102:1–3.) This comment was also pointed out to Harbarger: "Q. Are other employees who aren't pumping also expected to put in a solid 8? A. Yes. Q. So do you have any understanding of why he said this in the way that he did? Did he ever tell you, explain it to you? A. No." (Pl. Exh. 4, Harbarger Dep. at 84:8–14.)

(*Id.*) Frier told Harbarger that Caban was pumping because he "thought it was interesting and important for a supervisor to know what's going on with their employees." (Pl. Exh. 2, Frier Dep. at 101:1–6.) On Thursday, Frier again emailed Harbarger to note that Caban was working insufficient hours and again mentioned pumping, saying that he would check with Salling about the rules for paying employees while they were pumping. (Def. Exh. 14, ECF No. 33-16; Pl. Exh. 23, ECF No. 40-23 (hereinafter "Email re: Kira").) But, Caban did get paid during the time that she pumped. Salling testified that Frier had asked her about the policy and she had clarified that Caban should get paid: "Everyone else got paid. She was going to get paid. He just didn't know, so." (Def. Exh. 4, Salling Dep. at 127:13–18.)

On March 9, Caban found Frier outside the file room. Having finished pumping, Caban opened the door and found Frier reading the "Pumping in Progress" post-it note. (Def. Exh. 1, Caban Dep. at 110:6–13.). Caban could not tell exactly what he was doing—whether he was listening at the door or simply reading the note. (*Id.* at 110:17–111:6.) Caban offers two versions of this incident. In one, she remembers that she said hello and that "he snapped up and said hello and walked away." (*Id.* at 110:12–13.) In another, Caban states that Frier did not respond to Caban's greeting at all and walked away. (Pl. Exh. 1, Caban Decl. ¶ 13.) Frier does not recall the incident. (Pl. Exh. 2, Frier Dep. at 108:16.)

### E. Caban's First Week Attendance

The parties dispute what hours Caban worked during her first and only week at MET. A series of emails between Frier, Harbarger, and Salling reveal that they were tracking Caban's comings and goings from the office.

On Tuesday, Frier emailed Harbarger to inform him of Caban's hours. (Email re: A word about Kira.) He wrote that, on Monday, "she was gone by 4:30," and that, on Tuesday, she arrived

at 8:45AM and was gone by 4:45PM. (*Id.*) On Wednesday, Frier emailed Harbarger documenting that Caban arrived at 8:45AM, left at 11:45AM, returned at 2:30PM, and was gone for the day by 4:20PM. (Email re: Kira's time.) That day, Caban recorded two hours of personal time to go to the doctor's appointment.[2] (Def. Exh. 11, ETimesheet, ECF No. 33-13; Email re: Kira's time.)

On Thursday, Frier emailed Harbarger, saying that Caban arrived at 8:45AM and left at 4:10PM with at least an hour for lunch. (Email re: Kira.) The full email reads:

> Sherry is quite annoyed about Kira's hours. According to Sherry, Kira came in at 8:45, took at least an hour out for lunch with Sara and was gone sometime before 4:10. She pumps for at least an hour a day. Sherry needs to check the rules about pay during pumping. I'm not too happy about it either.

(*Id.*) When asked what he meant by "I am not too happy about it either," Frier explained, "I was referring to Kira's hours. As in Sherry's quite annoyed and I am not too happy about it either . . . I was neutral on the pumping, neither happy nor sad about the pumping. I support pumping in the workplace as a matter of principle." (Pl. Exh. 2, Frier Dep. at 109:12–110:6.)

A year and a half after the fact, Salling documented Caban's hours in an email to Frier. (Def. Exh. 10, Email re: timeline of Kira's hours, ECF No. 33-12.) Salling listed the hours as: Monday, 8:45AM to 4:10PM; Tuesday, 8:45AM to 4:20PM; Wednesday, 8:45AM to 4:20PM; Thursday, 8:45AM to 4:10PM; and, Friday, 8:40AM to termination. (*Id.*) In her testimony, Salling cannot explain how she remembered these events after such a long time, but she believes she derived some of the times from emails. (Pl. Exh. 3, Salling Dep. at 152:2–20.)

It is Caban's testimony that, every day, she arrived between 8:30AM and 8:45AM and left between 4:10PM and 4:45PM. (Def. Exh. 1, Caban Dep. at 49:7–50:19.) Caban states, "between March 7 and 10, I worked at least eight hours per day; some of this work was performed at my

---

[2]    Caban's testimony revealed, for the first time, that she actually went to a job interview during this time. (Def. Exh. 1, Caban Dep. at 57:17–58:16.) MET did not know about the interview before terminating her employment.

home." (Pl. Exh. 1, Caban Decl. ¶ 15.) Taking Caban's testimony as true, she never spent 8.5 hours at the office and, on at least some days, failed to spend eight hours at the office. Rather than dispute MET's assertion that she arrived late and left early, Caban asserts that MET's attendance policies were improperly explained. Caban declares that no one provided her with a copy of the employee manual, (*id.* ¶ 14); no one told her that, "even as an exempt employee [she] was required to take a thirty-minute unpaid lunch break each day," (*id.* ¶ 25); and, no one informed her that she could not report remote work on her time sheet, (*id.* ¶ 14). Caban adds that, prior to her termination, no one told her that there was "anything wrong" with her hours. (*Id.* ¶ 16.)

Caban recorded on her timesheet that she worked eight hours each day, except for the two hours of personal time. (Def. Exh. 11, ETimesheet.) At her deposition, when asked "If MET . . . didn't know that you were working at home, wouldn't it have been reasonable for them looking at the timesheets and your comings and goings to conclude that you weren't logging hours correctly?" Caban answered, "Yes." (Def. Exh. 1, Caban. Dep. at 113:3–8.) Accordingly, it is undisputed that Caban did not work eight hours at the office at least some of the days.

### *F. Termination*

Early on March 11, Frier, Harbarger, and Salling met to discuss Caban. They concluded that she was lying on her timesheet by recording eight hours a day. (Def. Exh. 7, Harbarger Dep. at 44:5–7, ECF No. 33-9.) Harbarger described "the gist of the conversation," (*id.* at 61:6-7):

> The fact that her very first day she arrived late and left early and lied on her time and every subsequent day she arrived late and left early as well as taking a long lunch.[3] So she was lying on her time. We have expectations and would certainly think somebody in their very first week of employment would try to put their best foot forward and try to impress that yes, you made the right choice in hiring me. We were getting the opposite from her.

---

[3]    Caban disputes this characterization: "Frier claims that I took a 'long lunch' on the first and 'every subsequent day.' To my understanding, Frier authorized and paid for the long lunch of March 7, 2016. There were no other long lunches." (Pl. Exh. 1, Caban Decl. ¶ 22.)

(*Id.* at 60:16–61:4.) They all agreed to terminate Caban's employment because "[she] cheated on her time sheet." (*Id.* at 44:12–15 ("It was a mutual decision."); Pl. Exh. 2, Frier Dep. at 24:14–25:15; Pl. Exh. 3, Salling Dep. at 23:17–18 ("She was terminated because she entered 8 hours when in fact she did not work 8 hours").) They did not consider giving her a discipline short of firing, (Def. Exh. 7, Harbarger Dep. at 60:7), nor did they ask her to explain her timekeeping as they had asked other employees in the past, (*id.* at 120:13–122:10). Frier testified, "I didn't feel like we needed to [talk about her hours]. At will employment, she cheated on her time sheet and I thought firing her was justified." (Pl. Exh. 2, Frier Dep. at 80:10–16.)

That day, the Friday of Caban's only week at MET, Caban again showed up after the expected 8:30AM start of the work day. Caban's normal daycare cancelled that morning. (Def. Exh. 1, Caban Dep. at 90:3–5.) Because Caban knew she had to be at work, she called her husband at his job in Bethesda and told him to come pick up the baby at MET. (*Id.* at 90:5–13.) Caban then brought the baby to work arriving sometime around 8:40AM. (*Id.* at 90:17–20.)

Just after Caban got to her office, Harbarger walked in and said he needed to talk to Caban in his office. (*Id.* at 91:13–92:2.) Caban testified that the conversation went like this:

> [Harbarger] said, I think we need to part ways. And I said, I'm not sure why. And he said, Well, you're logging in the incorrect hours. And I said, Of course I'm logging in the correct hours. I'm even working from home. And he said, You didn't have approval to do that, and bringing a baby in the office is completely inappropriate.

(*Id.* at 92:1–9.) Harbarger testified similarly. Harbarger stated that he fired her first, explaining that she was logging inaccurate hours, and that she responded that she had been working from home. (Pl. Exh. 4, Harbarger Dep. at 125:14–126:3.) Harbarger does not dispute that he commented on the inappropriateness of bringing a baby into the office. Instead, he confirms that he said it "[b]ecause I thought it was inappropriate to bring an infant to work." (*Id.* at 124:20–21.)

10

MET continues to explain its decision to terminate Caban's employment as a reaction to her violation of MET's attendance and timekeeping policies. (Pl. Exh. 10, Interrogs. at 3–4.) In other words, Caban was terminated "for lack of work and falsely recording hours of work." (Pl. Exh. 12, Position Statement at 1.) MET asserts that the fact that Caban brought her baby to work did not bear on its decision. (*Id.* at 2.) Although MET does not allow employees to bring children to work, it provides eight hours per quarter for parents to use when their childcare falls through. (*Id.*) These hours were available to Caban, but it is unclear whether she knew they existed because Salling never went over benefits with her. (*See* Pl. Exh. 3, Salling Dep. at 25:4–8.)

In June, MET replaced Caban by hiring Joe Bivens, a man. (Pl. Exh. 10, Interrogs. at 7.)

## II. Motion for Summary Judgment

### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The moving party bears the burden of demonstrating the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Any dispute of fact, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). At this stage, we do not weigh evidence or make credibility determinations. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 248 (4th Cir. 2015). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the non-moving party, then a genuine dispute of material fact exists, and summary judgment should be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Bertrand v. Children's Home*, 489 F. Supp. 2d 516, 518 (D. Md. 2007) (citing *Anderson*, 477 U.S.

at 248) ("A fact is material for purposes of summary judgment, if, when applied to the substantive law, it affects the outcome of the litigation.").

In this case, it is MET's burden to show that it is entitled to judgment as a matter of law, but Caban has the burden of persuasion in establishing her discrimination claims. This means that the Court views the evidence in the light most favorable to Caban, but Caban still must present enough evidence to show that there is a genuine issue of material fact for trial.

### B. Analysis

Title VII makes it unlawful for an employer to discharge or otherwise discriminate against any individual because of her sex. 42 U.S.C. § 2000e-2(a). As a result of the Pregnancy Discrimination Act, Title VII provides that "because of sex" encompasses "because of or on the basis of pregnancy, childbirth, or related medical conditions" and that "women affected by pregnancy . . . shall be treated the same for all employment purposes . . . as other persons not so affected but similar in their ability and inability to work." 42 U.S.C. § 2000e(k). Pregnancy discrimination claims are analyzed in the same manner as other Title VII sex discrimination claims. *DeJarnette v. Corning Inc.*, 133 F.3d 293, 297 (4th Cir. 1998).

Caban attempts to establish her sex discrimination claims through the *McDonnell Douglas* burden-shifting framework. (Opp. M.S.J. at 17, ECF No. 40.) *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This approach involves "three stages at which the burden of evidentiary production is shifted back and forth between the plaintiff and defendant." *Weathersbee v. Balt. City Fire Dep't*, 970 F. Supp. 2d 418, 431 (D. Md. 2013). Although the production burden shifts, the burden of persuasion always remains with the plaintiff. *Id.*

In the first stage of *McDonnell Douglas*, the plaintiff must establish a prima facie case of discrimination. *Id.* (citing *Merritt v. Old Dominion Freight Line*, 601 F.3d 289, 294 (4th Cir.

12

2010)). The precise formulation of the prima facie case varies based on the facts. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802 n.13). In general, a plaintiff must show "that the employer took adverse action against [her] 'under circumstances which give rise to an inference of unlawful discrimination.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

At the second stage, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). "Because the employer's burden is one of production and not of persuasion, [the employer] 'is not required to prove absence of a discriminatory motive, but [must] merely articulate some legitimate reason for its action." *Chika v. Planning Research Corp.*, 179 F. Supp. 2d 575, 581 (D. Md. 2002) (quoting *EEOC v. Clay Printing Co.*, 995 F.2d 936, 941 (4th Cir. 1992)).

At the third stage, the plaintiff must "put forth evidence that, if believed, could convince a finder of fact that the employer's purported reasons were pretextual, and that the actual basis for its employment decision was" unlawful. *Weathersbee*, 970 F. Supp. 2d at 434. A plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact. *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001). Once the plaintiff offers such circumstantial evidence, the case must be decided by a trier of fact and cannot be resolved on summary judgment. *Id.*

Caban has alleged three Title VII claims: discrimination based on recent pregnancy and childbirth, discrimination based on lactation, and discrimination based on sex, all pursuant to 42 U.S.C. §§ 2000e-2(a), 20000e(k). (Compl., ECF No. 1.) The allegations, testimony, and arguments focus almost exclusively on Caban's status as a new mother rather than on her status as

13

a woman. (*See* Opp. M.S.J. at 43.) Therefore, in determining MET's motion for summary judgment, the Court analyzes Caban's three claims together as a sex discrimination claim on the basis of her recent pregnancy. *See, e.g., Holmes v. e.spire Commc'ns*, 135 F. Supp. 2d 657, 660 n.3 (D. Md. 2001) (addressing only pregnancy discrimination because, although plaintiff alleged sex discrimination, she did not attempt to support a discrimination claim on any other basis than pregnancy). The Court concludes that MET has failed to carry its burden of showing that there are no genuine issues of material fact.

### 1. Prima Facie Case

At stage one, Caban must establish a prima facie case. Broadly stated, this involves producing evidence that: (1) she belongs to a protected class; (2) "she was performing her duties in a satisfactory manner that met her employer's legitimate expectations"; (3) she suffered an adverse employment action nonetheless; and (4) the circumstances of the adverse action give rise to the inference that it was motivated by unlawful considerations. *Jones v. United Health Grp.*, Civ. No. JKB-17-3500, 2019 WL 1903668, at *7 (D. Md. Apr. 29, 2019). Caban relies on the failure to hire and discriminatory discharge theories in setting forth her prima facie case.

### i. Failure to Hire

Caban asserts that this is a failure to hire case. (Opp. M.S.J. at 17.) If true, Caban would not have to show that she met her new employer's legitimate expectations; rather, she merely would have to show that she was qualified for the position. Caban argues that this framework is warranted because her direct supervisor was out of town during her first four days and never observed a single day's work. (*Id.* at 18.) Caban does not cite any cases in which a court considered the termination of a new employee to be equivalent to a failure to hire her at all. In fact, courts routinely analyze cases involving employees who are hired then quickly fired under a

14

discriminatory discharge theory. *See Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991); *see also EEOC v. Gaddis*, 733 F.2d 1373, 1379 (10th Cir. 1984). Consequently, the Court sees no reason to eliminate employer expectations from the equation. The Court proceeds to the *McDonnell Douglas* framework that befits a discrimination claim asserting wrongful termination.

### ii. Discriminatory Discharge

To establish a prima facie case for discriminatory discharge, Caban must show that: (1) she was a member of a protected class; (2) she was performing her job in a satisfactory manner that met her employer's legitimate expectation at the time of her termination; (3) she was nonetheless terminated; and (4) "the prohibited conduct in which [s]he engaged was comparable in seriousness to misconduct of other employees outside the protected class who received less severe discipline." *Haynes v. Waste Connections, Inc.*, --- F.3d ---, 2019 WL 1768918, at *2 (4th Cir. Apr. 23, 2019). The first and third elements are not disputed. As a woman, Caban is a member of a protected class, and that protection extends to issues of recent pregnancy. 42 U.S.C. § 2000e(k). MET terminated Caban and replaced her with a man. The unresolved elements are whether Caban satisfactorily performed her job and whether the circumstances of her termination give rise to an inference of discrimination because other employees engaged in similar misconduct and were not terminated.[4]

### a. Employer's Legitimate Expectations

The Fourth Circuit's recent articulation of the prima facie elements reveals that an employee may commit some misconduct while meeting the employer's legitimate expectations. In other words, "a showing of satisfactory performance does not require the plaintiff to show that

---

[4] MET primarily argues that Caban fails to carry her burden on the employer's legitimate expectation element. (M.S.J. Mem. at 21, ECF No. 33-1.) In contrast to the Court's articulation, MET states the fourth element as: "the position was filled by a similarly qualified applica[ant] outside her protected class or the position remains vacant." (*Id.* (citing *Miles v. Dell Inc.*, 429 F.3d 480, 487 (4th Cir. 2005)).) Based on its articulation, MET does not dispute the fourth element at all.

[s]he was a perfect or model employee." *Haynes*, 2019 WL 1768918, at \*4. Rather, a plaintiff must show that she was performing "well enough" to dispel the possibility that she was fired for absolute or relative inadequacy. *Huang v. Gutierrez*, Civ. No. AW-08-2882, 2010 WL 93274, at \*5 (D. Md. Jan. 5, 2010); *see id.* at \*8 (holding plaintiff made prima facie showing of meeting expectations where plaintiff presented evidence that employer gave her satisfactory reviews); *Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 865 (D. Md. 2000) (holding positive overall reviews supported plaintiff's "minimal burden of showing satisfactory performance for purposes of summary judgment"). With that in mind, the Court turns to whether Caban was performing her job in a satisfactory manner that met her employer's legitimate expectations.[5]

An employer has discretion to determine its own legitimate expectations for its employees. *See Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980) ("It is the perception of the decision maker which is relevant."). MET stated that the only reason it terminated Caban's employment was her violation of its attendance and timekeeping policies. According to the employee manual, MET expected its salaried employees to work a minimum of eight hours each day, to work those regular hours at the office, to take a half hour for lunch, and to honestly record the time that they worked at the office. Disciplinary notices confirm that supervisors and employees alike were aware of these polices and that these policies were enforced.

In a discriminatory discharge case, the focus is not on an employee's qualifications but rather "on other aspects of the employment, such as poor job performance or infractions of company rules." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 514 (4th Cir. 2006). Even viewing the evidence in Caban's favor, Caban did not meet MET's expectations. She testifies that she always arrived between 8:30AM and 8:45AM and left between 4:10PM and 4:45PM. These

---

[5]   Courts may merge the "legitimate expectations" analysis with the pretext analysis, but it is not required. *See Volochayev v. Sebelius*, 513 F. App'x 348 (table), 2013 WL 871193, at \*4 (4th Cir. Mar. 11, 2013).

numbers show that Caban never spent the requisite 8.5 hours at the office. Although Caban asserts she worked at least eight hours a day, she admits that some of that work was done remotely. Except for Wednesday of the relevant week, Caban recorded that she worked eight hours each day even though she did not work eight hours a day at the office as MET expected.

Where a plaintiff has violated a policy, and allegedly an employer's expectation, she may put forward evidence—and create an issue of fact—that the expectation was not legitimate. *See Haynes*, 2019 WL 1768918, at *4 (holding employer expectation element was genuinely disputed where employee violated company policy by texting his supervisor but employee presented evidence that they always communicated by text). In crafting this step, the Fourth Circuit was "cognizant of the danger that courts might apply the 'expectations' or 'qualification' element of the prima facie too strictly in some cases, resulting in the premature dismissal of potentially meritorious claims of unlawful discrimination." *Warch*, 435 F.3d at 516. The Fourth Circuit explained the concern using the following hypothetical: a truck driver loses her license and is terminated for failing to meet legitimate employer expectations, namely, that she have a license to drive her truck. *Id.* The hypothetical employer could terminate the driver, using this legitimate expectation as pretext to obscure its unlawful consideration, i.e., that she is female. *Id.* "Evidence tending to show this pretext might be that similarly situated men who lost their licenses were not terminated but, instead, were temporarily suspended until they received new licenses or were transferred to other jobs within the company." *Id.* This evidence, concluded the Fourth Circuit, is appropriate at the prima facie stage even though it would be relevant to show pretext too.

Caban's evidence challenges the legitimacy of MET's stated expectations in at least two ways. First, she challenges that MET legitimately expected her to conform to its policies considering MET's repeated failures to explain them to her. Second, she uses evidence of similarly

17

situated male employees to show that MET did not enforce its policies as strictly against other employees.

Turning to the first, it is genuinely disputed the extent to which Caban knew of the policies regarding regular working hours and remote work. Caban never saw the employee manual. Salling testified that she told Caban that the manual was available online, but Caban testifies that Salling told her Salling would send her a copy. Thus, it is disputed that Caban knew where to find it. The employee manual contained specific details about working at MET, and those details were not common to all work places. For example, while many employers require eight-hour days, it is substantially less common for employers to require that those eight hours be worked at the office or that its employees take a mandatory half hour for lunch. These details would not have been intuitive to a new employee. Caban does not dispute that she knew she needed to work eight hours a day; rather, Caban asserts that she did not know that she needed to work eight hours in the office during core work hours and that she needed to take a half hour lunch break. Regarding remote work, Caban appeared to know that she should request to work remotely, but she did not know that remote work would not be counted toward her eight-hour minimum. MET argues that Caban cheated on her timesheet, but, if Caban's testimony is true, as the Court assumes at summary judgment, Caban did not knowingly lie and, thus, cheat.

The way in which MET trained Caban indicates what it legitimately expected of her. *See, e.g.*, *Nilson v. Historic Inns Grp., Ltd.*, 903 F. Supp. 905, 908 (D. Md. 1995) (finding genuine issue of material fact where employer terminated employee for altering her subordinates' timesheets and employee offered evidence that she was explicitly trained to alter those timesheets). Where an employer makes clear a policy to an employee, such that the employee is aware of the policy and the consequences of violating it, a legitimate expectation is established. *See, e.g.*, *Carr v. Md.*

18

*Grocery Store Co.*, Civ. No. GLR-17-244, 2019 WL 1427779, at *7 (D. Md. Mar. 29, 2019) (finding plaintiff did not show genuine issue of material fact on employer expectation element because she admitted to violating a policy and, further, knew violating the policy was "wrong"—an admission the court found was "irreconcilable with meeting her employer's expectations"); *Cooper v. Micros Sys., Inc.*, Civ. No. CCB-14-1373, 2015 WL 6549093, at *3 (D. Md. Oct. 27, 2015) ("Cooper verbally threatened a co-worker, an act which he knew violated company policy and could lead to discharge, and one which MICROS believed warranted discharge."); *Jones v. Dole Food Co.*, 827 F. Supp. 2d 532, 547 (W.D.N.C. 2011) ("When an employee is aware of an employer's policy and violates it, he has not met the employer's legitimate expectations."). In short, an employer cannot expect—not legitimately nor reasonably—that its employees will meet a policy it has not made clear. Here, there is a dispute of fact as to whether MET informed Caban of its attendance and timekeeping policies and what she managed to learn about them.

In addition to failing to make clear its policies to Caban, MET undisputedly did not seek to correct her behavior once she began violating its policies. *Cf. Warch*, 435 F.3d at 517 (holding employer expectations were legitimate based on number of warnings employee received regarding his performance); *Farasat. v. Paulikas*, 32 F. Supp. 2d 249, 255 (D. Md. 1998) (holding plaintiff was not meeting employer's legitimate expectations at time of discharge where, despite warnings, he was constantly late to work). At MET, direct supervisors typically choose their subordinates' work shifts and go over the policies in the employee manual. Because Harbarger was out for Caban's first week and Salling did not go over the employee manual in his absence, MET could not have expected Caban to know the intimate details of the manual's chapters on regular and remote work. Throughout Caban's first week, no one approached her to explain that she was consistently violating policies even though it would have been reasonable to suspect that a new

19

employee failing to adhere to company policies might not yet understand what those policies were. The Court has no doubt that MET has a general expectation that its employees abide by the policies in the employee manual. But, the Court does doubt that MET could have reasonably expected Caban to abide by them when it expounded little energy in ensuring that she knew them.

As for the second argument, Caban points out that MET enforced the attendance and timekeeping policies more harshly against her. *See Huang*, 2010 WL 93274, at *8 (finding dispute of fact as to legitimacy of expectations where plaintiff showed the expectations "were not in fact expectations of all employees, but rather, were unique to her"). Caban offers comparator evidence of employees who violated the same policies but were not terminated. Comparators must be "similar in all relevant respects," including being subject to the same supervisors and performance standards, and having "engaged in the same conduct without [meaningful] differentiating or mitigating circumstances." *Haywood v. Locke*, Civ. No. 09-1604, 387 F. App'x 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)); *see Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) ("[T]he purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable . . .").

That said, "a comparison between similar employees 'will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances.'" *Haynes*, 2019 WL 1768918, at *3 (quoting *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993)); *see id.*, at *4 (finding appropriate comparator where white employee had the same supervisor, committed similar infractions—even more of them than black plaintiff— and, yet, was not terminated). The question at the summary judgment stage is whether a reasonable factfinder could conclude that plaintiff and the proposed individual were proper comparators.

Caban offers three comparators. One of them cannot be used as a comparator because there is no evidence that the comparator employee ever reported to the same supervisor as Caban or was ever disciplined by Caban's supervisors, namely, Harbarger or Frier. For the most part, where different decisionmakers are involved, employees are not similarly situated. *Thomas v. City of Annapolis*, Civ. No. BPG-16-3823, 2018 WL 4206951, at *6 (D. Md. Sept. 4, 2018). The other two are proper comparators. They are male MET employees and, thus, bound by the attendance and timekeeping policies. These two male employees violated either the attendance or timekeeping policy, participating in the same type of misconduct as Caban. At the time that they violated these policies, they either reported to Frier or were disciplined by Frier.

The first comparator, KL, watched pornography at work. Allan Kimani directly supervised KL and discovered that KL was watching pornography at the MET facility during work hours. (Pl. Exh. 7, Kimani Dep. at 26:8–14, ECF No. 40-7.) Kimani reported the incident to Salling and issued a write-up, which explained that watching pornography on company equipment and during work hours violated company policy. (Pl. Exh. 19, Notice, ECF. No. 40-19.) Watching pornography during work hours also necessarily meant that KL was not working at those times. Kimani believes he recommended termination because he thought "it was an unacceptable act at the time." (Pl. Exh. 7, Kimani Dep. at 30:6–11.) Kimani met with Frier to discuss KL. (*Id.* at 31:13–20.) Ultimately, they barred KL from using his phone at work, placed him on probation, and warned him that another violation would result in termination. (*Id.* at 26:14–27:2.) Kimani caught KL watching porn a second time. (*Id.* at 35:15–36:6.) Once again, MET warned KL that future infractions would result in termination. (*Id.* at 36:7–10.) The timesheets reflect that KL was compensated for the time he spent watching pornography. (*Id.* at 36:18–38:13; *see* Pl. Exh. 27, ETimesheet, ECF No. 40-27.) Kimani was not asked to monitor KL's time going forward.

21

(Pl. Exh. 7, Kimani Dep. at 27:6–28:18.) Salling, too, recommended KL's termination because his actions violated the code of conduct and constituted "time stealing," in that "he was supposed to be testing equipment and he was watching pornography." (Pl. Exh. 3, Salling Dep. at 100:1– 21.) Frier declined to terminate because the company was "shorthanded." (*Id.* at 99:5–12.)

The second comparator, JF, regularly arrived late. JF held positions as a Quality Manager and Business Development for MET. (Pl. Exh. 2, Frier Dep. at 37:3–11.) At one point, Frier was his direct supervisor. (*Id.* at 34:6–9.) As Frier's subordinate, JF arrived late on several occasions, and, consequently, Frier checked JF's timesheets "to see what hours he was recording for [each] day if he was arriving late." (*Id.* at 29:2–17.) When Frier asked JF if he recorded his time properly, JF affirmed that he did. (*Id.* at 38:14–20.) Steven Pitta later became JF's supervisor. JF obtained a Family and Medical Leave Act ("FMLA") accommodation to arrive two hours late every day. (Pl. Exh. 6, Pitta Dep. at 10:5–7.) Even so, JF regularly showed up much later than his accommodation. (*Id.* at 29:1–13.) During 2017 and 2018, Pitta issued three write-ups describing how JF arrived late—once, for four days in a row—and advising JF to "work core hours and arrive to work within the FMLA accommodations." (Pl. Exh. 21, Notice, ECF No. 40-21.) Pitta found it so difficult to keep track of whether JF was working eight hours that Pitta changed JF's status from salaried to hourly. (Pl. Exh. 6, Pitta Dep. at 29:14–21.) Frier approved the status change. (*Id.* at 30:16–31:13.) Like KL, JF was not terminated for violating MET's attendance policy.

These comparators were outside of Caban's protected class because they were male employees who were not dealing with the medical consequences of a recent pregnancy. They engaged in similar misconduct but received dissimilar punishment. Instead of terminating them, MET asked them about their timekeeping, checked their timesheets, and issued write-ups. By contrast, Frier did not investigate Caban's explanation that she worked from home: "There was no

evidence that she did work from home, but it would have been irrelevant anyway because she wasn't permitted to work from home." (Pl. Exh. 2, Frier Dep. at 146:9–12.) When asked what he did to investigate, Frier said, "I didn't do anything to try to obtain evidence." (*Id.* at 147:1.) The comparators show that other employees—specifically, non-breastfeeding male employees—who engaged in this type of misconduct were still deemed to have performed satisfactorily, or, "well enough" to avoid termination. *See Huang*, 2010 WL 93274, at *5.

Caban raises a dispute of fact both genuine and material: whether she was performing her job in a satisfactory manner that met MET's legitimate expectation at the time of her termination.

### b. Inference of Discrimination

The comparator evidence is also relevant to show that Caban committed similar misconduct as those outside of her protected class but received harsher discipline than they did. The comparator evidence alone creates a dispute of fact as to whether the circumstances of Caban's termination gives rise to an inference of discrimination. *See, e.g., Jordan v. Radiology Imaging Assocs.*, 577 F. Supp. 2d 771, 783 (D. Md. 2008) (finding an inference of discrimination where two positions were redundant and "a pregnant employee's position was selected for elimination instead of a non-pregnant employee's position"). But, Caban presents additional evidence—in the form of Frier's comments about her recent pregnancy—that supports such a finding.

In enforcing its attendance and timekeeping policies against Caban, MET, and specifically Frier, made regular reference to the fact that she was pumping during the work day. For comments to indicate discrimination, "they must not be isolated, and must be 'related to the employment decision in question.'" *Loveless v. John's Ford, Inc.*, 232 F. App'x 229, 234 (4th Cir. 2007) (quoting *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 2007)). Some nexus must exist between the derogatory comment and any of the employment decisions. *EEOC v. CTI*

23

*Glob. Sols., Inc.*, 815 F. Supp. 2d 897, 906 (D. Md. 2011). "Courts have considered the context of the statement, its temporal proximity to the adverse employment action, and the status of the person making the statement in determining whether such a nexus exists." *Id.* There is no question that a nexus exists in this case.

Frier's comments about Caban's recent pregnancy were made in the context of tracking her comings and goings from the office. Frier wrote in an email: "[Caban] is 'pumping' several times a day. . . . She certainly has every right to do that and I believe it can be done in work time. However, if I were pumping (which I am not). I would try to make sure I put in a solid 8." (Email re: A word about Kira.) Frier admitted that his comment that he was not pumping was a joke, (Pl. Exh. 2, Frier Dep. at 102:1–3), implying, presumably, that he is not pumping because he is a man. He ties this comment directly to Caban's hours when he says, "I would try to make sure I put in a solid 8." (Email re: A word about Kira.) In another email, Frier again tied his frustration about Caban's hours to pumping by listing her hours and adding, "She pumps for at least an hour a day." (Email re: Kira.) In that same email, Frier states that he is "not too happy" about Kira's hours and that he will check with Salling regarding "rules about pay during pumping." (*Id.*)

Frier's comments were also temporally proximate to Caban's termination. Within four days of learning that Caban was breastfeeding, Frier and Harbarger decided to terminate her employment. Over the span of those four days, Frier commented on Caban's breastfeeding in the context of tracking her comings and goings. In addition, it appears that Frier might have been tracking the amount of time Caban spent pumping. On Wednesday, Frier encountered Caban outside her file room. Caban admits that she is not entirely sure what Frier was doing—either reading her post-it note or listening at the door. On Thursday, the day before Frier and Harbarger terminated Caban's employment, Frier mentioned, in an email, that Caban was pumping for at

24

least an hour every day. Viewing these events in Caban's favor, as the Court must, it is reasonable to infer that Frier was keeping track of Caban's pumping time, too.

Regarding the status of the speaker, Frier was the CEO of MET and an active participant in disciplining MET employees for attendance and timekeeping infractions. Frier did not know about Caban's recent pregnancy and need for pumping accommodations before March 7. He began recording her hours on March 8. He asked Salling about the policy for paying employees who are pumping at work on March 10. And, with Caban's direct supervisor, Harbarger, he decided to terminate her employment on March 11. A nexus exists between Frier's comments about Caban's recent pregnancy and the termination of her employment at MET.

Thus, Caban raises a second genuine and material dispute of fact: whether the circumstances of her termination gave rise to an inference of discrimination. At summary judgment, these disputes of fact are viewed in Caban's favor. Therefore, a reasonable jury could find that Caban sustained her prima facie burden for Title VII pregnancy discrimination.

### 2. *Legitimate Nondiscriminatory Reason/Pretext*

MET claims that it has a legitimate nondiscriminatory reason for terminating Caban's employment: Caban violated its attendance and timekeeping policies. Because poor job performance is a legitimate nondiscriminatory reason for termination, a plaintiff must produce evidence that the stated reason is false or not credible to survive summary judgment. *Glunt*, 123 F. Supp. 2d at 868; *see id.* (holding sufficient showing of pretext where plaintiff offered evidence undercutting employer's stated reason for demoting her).

Notably, where an employer hires an employee knowing the employee is within a protected group, then quickly fires that person, a "strong inference" arises that the reason behind termination was not discrimination. *Proud*, 945 F.2d at 798; *see Evans v. Techs. Applications & Servs. Co.*,

25

80 F.3d 954, 959 (4th Cir. 1996) ("[B]ecause Houseman is the same person who hired Evans, there is a 'powerful inference' that the failure to promote her was not motivated by discriminatory animus."); John J. Donahue III & Peter Siegelman, *The Changing Nature of Emp't Discrimination Litig.*, 43 Stan. L. Rev. 983, 1017 (1991) ("Claims that employer animus exists in termination but not in hiring seem irrational: It hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job."). "In short, employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing." *Proud*, 945 F.2d at 798. Here, Frier and Harbarger knew that Caban was a woman when they hired her. This fact creates a strong inference that they did not subsequently fire her because of her sex. But, Frier did not know that Caban was a mother, nor a recent mother, and neither Frier nor Harbarger knew that Caban was breastfeeding and would require pumping accommodations. *See Gaddis*, 733 F.2d at 1379 (affirming the stated reason that "no vacancy existed" was pretextual where employer did not know he was hiring a black employee and quickly fired the black employee to replace him with a white employee). Consequently, a "strong inference" against a finding of discrimination does not exist as to Caban's pregnancy discrimination claim. In fact, the temporal proximity between MET learning of Caban's recent pregnancy and her termination is indicative of discrimination and of pretextual firing.

Further, the same evidence that Caban put forward in her prima facie case shows pretext. *See Warch*, 435 F.3d at 516 ("[W]e find no impermeable barrier that prevents the [parties'] use of such evidence at different stages of the *McDonnell Douglas* framework."). This evidence includes: the fact that no one informed Caban of the policies she was violating on a daily basis; the repeated references to Caban's pumping while simultaneously tracking her hours; and, the similarly situated male employees who were less severely punished.

That no one informed Caban of the specific timekeeping policies and, more importantly, did not correct her behavior as she consistently violated them during her first week indicate a discriminatory motive. *See, e.g.*, *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 692 (7th Cir. 2007) (holding a jury could disbelieve university's stated reason because university never warned its tennis coach that "her foul language, poor driving, inattentiveness to trailing vehicles, and expression of frustration during a scheduling conflict could lead to dismissal"). Indeed, this makes sense. As Caban stated, if MET had a problem with the hours she was working or recording, MET could have addressed this "simple misunderstanding," as she called it, with her. (Pl. Exh. 1, Caban Decl. ¶ 28.) It is commonplace to correct a new employee's behavior, especially where, as here, that employee's supervisor is out of town and it is likely that her onboarding was incomplete. While a failure to warn is generally not direct evidence of discrimination, it does render suspect an employer's stated reason for termination.

Repeated references to Caban's recent pregnancy also support a showing of pretext. Frier commented, via email that, if he were pumping, he would make sure to put in a solid eight hours. Because all employees, according to the employee manual, are required to put in eight hours each day, Frier's comment indicates that he was scrutinizing Caban more strictly because she was breastfeeding. After Frier and Harbarger decided to terminate Caban's employment, Harbarger told Caban that it was completely inappropriate to have a baby at the office.[6] MET asserts that this comment came after the decision to terminate and had no bearing on the decision, but the comment provides insight into the minds of the ultimate decisionmakers. While employers may

---

[6]     MET's defense counsel argues that "Harbarger's comment was not discriminatory but rather a truism that, in general, workplaces are not a suitable place for infants." (M.S.J. Mem. at 21.) A truism, by definition, is "an undoubted or self-evident truth," especially, "one too obvious for mention." *Truism*, <u>Merriam-Webster</u> at 1268 (10th ed. 1997). The Court seriously doubts that it is a truth too obvious to mention that workplaces are not suitable for infants; perhaps counsel has never endured the experience of a last-minute childcare emergency. Counsel's argument is also irrelevant. The Court advises defense counsel to stick to the facts in the record, rather than basing arguments on unsupported platitudes.

prohibit infants in the workplace, as many do, this statement expressed in such proximity to Caban's termination suggests an intolerance for Caban's status as a new mother and, perhaps, an unlawful consideration in the termination itself.

The comparator evidence also shows pretext. MET has exhibited a very different response to its employees who have violated the timekeeping policy in the past. For example, KL was caught watching pornography at work twice and received probation both times. Even when Salling and Kimani recommended termination because of the egregiousness of the behavior, Frier overruled their recommendations. The notable difference between Caban and the two comparators is that they are male and she was a breastfeeding female. MET makes much of the fact that Caban was a new employee and should have been putting her best foot forward. (M.S.J. Mem. at 1.) As a new employee, MET implies, she should receive no leeway. (*Id.*) This argument is not totally lacking in merit. Looking to the unique circumstances here, however, it seems strangely harsh to hire someone only to terminate her for violating policies of which she was, at best, barely informed. Her status as a new employee is not enough to dispel the genuine dispute of material fact as to whether MET's stated reason for terminating was pretext for discrimination.

Caban has raised several genuine issues of material fact. First, whether MET's expectation that its employees abide perfectly by its attendance and timekeeping policies was a legitimate one. Second, whether the *termination* of Caban—rather than discipline—gave rise to an inference of discrimination. Third, whether MET's stated reason was pretextual and the real reason was discrimination. These genuine disputes preclude judgment for MET as a matter of law.

III.     *Motion for Leave to File Surreply*

Caban moved for leave to file a surreply to MET's reply brief. (Mot. Leave File Surreply, ECF No. 46.) Caban seeks to respond to MET's articulation of the law as it relates to appropriate

28

comparator evidence and, in particular, to MET's citation to *Sillah v. Burwell*, 244 F. Supp. 3d 499

512–13 (D. Md. 2017), for the first time in reply. (Mot. Leave File Surreply Mem., ECF No. 46-

1.) MET argues that Caban fails to meet the standard for filing a surreply and that a surreply

should not be used to correct alleged legal misrepresentations. (Opp. Mot. Leave File Surreply,

ECF No. 47.) "Unless otherwise ordered by the Court, surreply memoranda are not permitted to

be filed." Local Rule 105(2)(a) (D. Md. 2019). The Court may choose to grant leave to file a

surreply where new evidence or a new legal theory is raised in reply. *F.D.I.C. v. Cashion*, 720

F.3d 169, 176 (4th Cir. 2013); *see id.* ("That Cashion failed to anticipate how the FDIC would

respond to his reliance on the 1099–C Form does not automatically entitle him to file a surreply.").

Because the Court is equipped to analyze the law on comparator evidence and the applicability of

*Sillah*, the Court denies Caban's leave to file a surreply.

## IV.    *Conclusion*

For the foregoing reasons, an Order shall enter denying Caban's motion for leave to file a

surreply and denying MET's motion for summary judgment.


DATED this __15__ day of May, 2019.

                                        BY THE COURT:


                                        _____

                                        James K. Bredar
                                        Chief Judge